UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| NICOLAS M. HADDAD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:05-CV-370-TLS |
| | ) | |
| ITT INDUSTRIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION**

The Defendant, ITT Industries, Inc., moves that Plaintiff Nicolas Haddad's Complaint be dismissed because it fails to state any claims for which relief can be granted. The Defendant's motion to dismiss for failure to state a claim is denied because it depends on an improperly narrow interpretation of the Complaint and because it does not take full account of the standard for dismissal under Federal Rules of Procedure 12(b)(6). The Defendant also argues that the Court lacks subject matter jurisdiction over two of the claims. This Court has subject matter over all of the Plaintiff's claims because they derive from a common nucleus of operative fact.

**A.      Standard for Dismissal under Federal Rule of Civil Procedure 12(b)(6)**

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint and not the merits of the suit. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). The court presumes all well-pleaded allegations to be true and views them in the light most favorable to the plaintiff, and accepts as true all reasonable inferences to be drawn from the allegations. *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th Cir. 1995). The court may also consider documents central to the claims that are attached to the complaint, or those referred to in a complaint, without converting a 12(b)(6) motion into one for summary judgment. *Tierney v.*

*Vahle*, 304 F.3d 734, 738 (7th Cir. 2002).

A motion to dismiss pursuant to Rule 12(b)(6) is granted only if it "appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Thomason v, Nachtrieb*, 888 F.2d 1202, 1204 (7th Cir. 1989). Federal notice pleading requires only that the plaintiff "set out in [his] complaint a short and plain statement of the claim that will provide the defendant with fair notice of the claim." *Anderson v. Simon*, 217 F.3d 472, 474–75 (7th Cir. 2000) (quoting *Scott v. City of Chicago*, 195 F.3d 950, 951 (7th Cir.1999)). "Facts need not be 'established' or even alleged (fact-pleading is unnecessary); a plaintiff receives the benefit of any fact that could be established later consistent with the complaint's allegations." *Simpson v. Nickel*, 450 F.3d 303, 306 (7th Cir. 2006). "Arguments that rest on negative implications from silence are poorly disguised demands for fact pleading" and "[s]ilence is just silence and does not justify dismissal unless Rule 9(b) requires details." *Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 715 (7th Cir. 2006).

**B.     Facts as Alleged in Plaintiff's Complaint**

The following facts are taken from the Plaintiff's Complaint and viewed in the light most favorable to the Plaintiff.

The Defendant is headquartered in New York and has its principal offices in White Plains, New York; McLean, Virginia; Washington D.C.; and Fort Wayne, Indiana. The Defendant manufactures a wide range of communications equipment, which it sells to commercial and government customers. Since the 1990's, the Defendant has marketed its Single Channel Ground & Airborne Radio System ("SINCGARS") to foreign governments for military

use. In the early 1990's, the Defendant began marketing SINCGARS to the Kuwaiti government.

The Defendant offered the Plaintiff the position of Program Manager to run the Kuwait office of ITT on February 8, 1995. The Plaintiff accepted the job and began employment about March 6, 1995. The Plaintiff reported to the Defendant's Program Management Office, and worked with the marketing staff in Fort Wayne.

The Plaintiff's Complaint describes in detail the negotiations between the Defendant and the Kuwaiti government. In 1997, the Defendant conducted an internal investigation and discovered a scheme by which the Defendant's Fort Wayne management officials would pay bribes to Kuwaiti officials in return for a contract to purchase SINCGARS systems. However, the Defendant also protected the senior managers who had knowledge of the scheme. The Plaintiff cooperated with the investigation and told the investigators that he believed the scheme was known and approved by senior management.

In October 2000, the Plaintiff was approached by an agent of the Defendant's in Kuwait, who promised to reward the Plaintiff with cash if the contract was awarded. The Defendant's Marketing Manager John Noble made the same offer to the Plaintiff. The Plaintiff rejected the offers.

During negotiations in 2001, the Plaintiff recommended to his division and the corporate staff that a 3% commission included in the contract with the Defendant's Kuwaiti agent be rescinded. The Plaintiff believed the 3% commission had been negotiated as part of the 1997 bribery scheme, and was to be paid as a bribe to Kuwaiti officials.

As the SINCGARS contract neared approval in February 2001, the Plaintiff was recalled from Kuwait to the Fort Wayne office where he could not monitor the Defendant's activities

with respect to the SINCGARS negotiations. The Defendant knew that the Plaintiff had become concerned that the Defendant's managers were using bribes to obtain the contract.

On September 18, 2002, the Plaintiff proposed that if the Kuwait contract did not go through, he could work on projects elsewhere. However, Rudolph Lewis, a Vice President of the Defendant's, stated he was certain the Defendant would get the Kuwait contract and that the Plaintiff would return to Kuwait to manage the project. About October 15, 2002, the Defendant obtained the $50 million SINCGARS contract. The Plaintiff began preparing to return to Kuwait. The contract team prepared the Kuwait Contract Action Register, dated December 17, 2002, which stated that the Plaintiff would depart in early January.

From March 1996 to 1999, the Plaintiff received satisfactory performance evaluations. He did not receive one for the 2000–2001 period. On December 17, 2002, Lewis falsely claimed that the Plaintiff had already been given his review for 2000–2001. Lewis told the Plaintiff another performance review was coming and it was not going to be good. Previously, Lewis had told the Plaintiff that any issues in his performance would be addressed as they arose instead of raising them for the first time in a performance review. Lewis had never before criticized the Plaintiff's performance. Shortly after this meeting, Lewis brought to the Plaintiff's office the 2000–2001 performance review. The Plaintiff stated he had never seen it before and that it was false. No dates accompanied the signatures of his supervisors and the review was on an old version of the form.

On December 19, 2002, the Plaintiff sent an e-mail to John Bligh, the Defendant's Vice President for Human Resources, and asked for a meeting to express his concerns that the performance reviews were false and raised no specific performance deficiencies. Though Bligh

read the e-mail, he claimed three weeks later that he had not seen it.

On about December 22, 2002, the Plaintiff asked Noble whether he would be going to Kuwait. Noble stated that Lewis had not yet decided whether the Plaintiff would return to Kuwait.

On January 6, 2003, the Kuwait Contract Action Register was updated to delete any reference to the Plaintiff being sent to Kuwait. On January 7, 2003, the Defendant circulated a new organizational chart dated January 3, 2003, for the SINCGARS program, and the Plaintiff was no longer listed as the Kuwait resident project manager. It now listed him as "export production." Also on January 7, 2003, the Plaintiff discovered additional information leading him to believe the Defendant was engaged in a bribery scheme.

On January 9, 2003, Noble stated at a meeting that the Kuwaiti customers were unhappy with the absence of a program representative in Kuwait and that the Defendant was interviewing a candidate that week. The Plaintiff commented that he thought he was the Defendant's representative in Kuwait, to which Noble made no response. Also at the meeting, additional information was revealed that supported the Plaintiff's belief the Defendant was engaged in a bribery scheme with Kuwaiti officials. Immediately following the meeting, the Plaintiff told Noble that he objected to the obviously illegal scheme and that he would fight it with everything he had.

About 30 minutes after the meeting the Plaintiff met his supervisors. They told the Plaintiff they were interviewing an outside candidate to serve as the Kuwait program manager. The Plaintiff was also directed not to discuss issues outside of the company. The Plaintiff objected. After the meeting he sent out an e-mail stating he would discuss whatever he wished,

whether to management or to the "law of the land," referring to government regulatory agencies.

Also at the meeting, the Plaintiff was given a performance review for 2001–2002. The review cited performance issues no one had raised with the Plaintiff before. The Plaintiff believed the review was inaccurate, and that he was given a negative review to coerce the Plaintiff to leave his position. The Plaintiff wrote to Bligh and expressed his concerns. Among his concerns was that the company and the program were being injured, referring to the bribery scheme.

At some point before January 22, 2003, the Plaintiff learned from another employee that the Defendant's managers had met to concoct a plan for setting up the Plaintiff's termination. On January 22, 2003, the Plaintiff met with his supervisors and the Defendant's Human Resource Managers, including Bligh. At this meeting, Bligh asked the Plaintiff to accept the performance review for 2002. The Plaintiff refused and Bligh stated that he was making a big mistake and would be terminated without pay. Bligh took the Plaintiff's identification badge and escorted him out of the building.

On January 23, 2003, the Defendant posted a job description for the program manager position in Kuwait. The job description did not list as a requirement that the applicant be fluent in Arabic, as was set forth in the 2001 Kuwait contract proposal. In fact, the Defendant had already interviewed another person, Carl Jungquist, and offered him the job. Jungquist was not fluent in Arabic. The Plaintiff is fluent in Arabic.

On January 30, 2003, Bligh met with the Plaintiff and gave him a letter stating that the Plaintiff was now suspended from work, and that it was the Defendant's desire that he return to work. However, Bligh told him the Plaintiff could only return to work if he accepted the

6

performance review.

On January 31, 2003, the Plaintiff wrote to the Defendant about his concerns with the Defendants Kuwait operations, including the lack of transparency of the Kuwait program.

In February 2003, an agent of the Defendant in Kuwait, who worked for a partner company, offered the Plaintiff a job if he would stop blowing the whistle.

Also in early February, the Plaintiff continued discussions with the Defendant's Human Resources personnel. He proposed an agenda for a meeting, which included bringing the Kuwait program "in line with our company's commitments and basic operating philosophies." (Compl. 20–21, DE 1.) The Plaintiff found out on February 6, 2003, that the Defendant hired Jungquist to fill his former position. On the same day, he received a letter from the Defendant that if he did not attend a meeting to discuss his performance on February 7 he would be terminated.

On February 6, 2003, the Plaintiff wrote to the Defendant's senior management, setting forth his concerns about the management of the Kuwait program. The Plaintiff received a response on February 10, 2003, from Defendant's CEO Lou Giuliano, who stated that he asked Rich Swanson, Director of Corporate Policy Compliance, to address the matters raised by the Plaintiff.

On February 11, 2003, the Plaintiff talked to Swanson and other in-house counsel about his concerns that the Defendant had been violating federal law and corporate policy with its bribery scheme. On February 19 and 20 the Plaintiff again met with in-house counsel to discuss these issues. At this meeting, Swanson told the Plaintiff he was not terminated, but that he was suspended. The Plaintiff continued to discuss the Kuwait contracts with the Defendant's counsel throughout April and May 2003. .

On March 5, 2003, the Plaintiff was provided a copy of a performance review covering the period from March 2001 to December 2002. It was signed by his supervisors and it gave him the lowest possible rating. The Plaintiff wrote back that it was a sham and developed with the intent to remove him from his job because he was an obstacle to the ongoing illegal activities.

On April 9, 2003, the Plaintiff filed a Sarbanes-Oxley whistleblower claim with the Department of Labor. The claim was dismissed without prejudice on November 30, 2004. In July 2003, the Plaintiff met with Department of Justice officials regarding his claims of illegalities related to the Kuwait contracts. He met with various other government officials for the next year.

On January 18, 2004, the Plaintiff received a job offer from the National Company for Mechanical and Electrical Works in Kuwait. He signed a contract on February 28, 2004. In March 2004, the Plaintiff was told by a friend in Kuwait that he received a call from an employee of the Defendant that the Defendant knew the Plaintiff was back in Kuwait. Several days later, on March 18, 2004, the Plaintiff was terminated from his job without explanation.

On November 19, 2004, the Plaintiff was notified by Bligh that his active employment with the Defendant ended in early 2003, and that he had been on inactive status since. Bligh stated that inactive status would end on November 30, 2004. Until then, the Defendant had been paying for the Plaintiff's health insurance coverage.

### C.     Procedural Background

The Plaintiff filed his Complaint in the District of Columbia on January 7, 2005. The Complaint states four claims against the Defendant. First, the Plaintiff claims that the Defendant violated 18 U.S.C. § 1514A by retaliating against him for providing information regarding the

8

Kuwait bribery scheme to a person with supervisory authority over the Plaintiff, or who had the authority to investigate, discover, or terminate misconduct. Second, the Plaintiff claims the Defendant wrongfully discharged him in violation of public policy. Third, the Plaintiff claims the Defendant tortiously interfered with his business relations. Fourth, the Plaintiff claims the Defendant blacklisted him in violation of Indiana Code § 22-5-3-2. The Plaintiff also brought claims against a Kuwaiti military officer, Colonel Ali Al-Sarraf.

The case was transferred to this Court on August 25, 2005, pursuant to 28 U.S.C. § 1406(a). On November 16, 2005, the Defendant filed the motion under consideration: to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6). The Plaintiff responded on December 5, 2005, and the Defendant replied on December 19, 2005. On August 22, 2006, the Court issued an Opinion dismissing Defendant Ali Al-Sarraf because it lacked personal jurisdiction over him.

### D.     The Plaintiff's Claim under 18 U.S.C. § 1514A

Title 18 U.S.C. § 1514A states that certain companies may not discriminate against an employee because the employee provided information to, or cooperated with an investigation by, a person with supervisory authority over the employee, or another person working for the employer who has the authority to investigate, discover, or terminate misconduct, if the information or investigation related to violations of specified statutes, securities regulations, or federal laws related to fraud against shareholders. 18 U.S.C. § 1514A. The Complaint states that the Plaintiff was terminated because he refused to cooperate with the Defendant's scheme to bribe Kuwait officials and because he insisted that the Defendant comply with the law. The

9

Defendant raises no issue at this point about whether providing information to superiors about bribery of foreign officials is protected activity.

The Defendant raises three arguments in support of its motion to dismiss the Plaintiff's § 1514A claim: first, that the Plaintiff has not pled facts showing he reported to his supervisors information about the alleged bribery scheme; second, that the Plaintiff did not engage in protected activity prior to any adverse employment action; third, that the Plaintiff's claims are barred by the 90 day statute of limitations.

The Defendant's argument that the Plaintiff did not report to his supervisors information about the bribery scheme fails. The Defendant's argument focuses on whether the Plaintiff provided information concerning the bribery scheme in his January 9, 2003, conversations with his supervisors. However, taking all inferences to favor the Plaintiff, and allowing for the possibility that the Plaintiff could produce additional evidence consistent with the Complaint, the Plaintiff could show he engaged in protected conduct on January 9. According to the Complaint, he told Noble he objected to the illegal bribery scheme and would fight it. Whether Noble was a supervisor or someone who has the authority to investigate, discover, or terminate misconduct is unknown, but the Plaintiff could produce evidence he was. He also sent an e-mail to his supervisors that he would discuss matters as he wished with the law of the land, and another e-mail to Bligh expressing his concern about injuries to the program and company. The Plaintiff could produce evidence consistent with these allegations showing that these e-mails were part of his attempt to make the bribery scheme known to his supervisors and others within the Defendant company. Also, the Complaint alleges that he informed the Defendant's investigators in 1997 that the 1997 bribery scheme was known and approved by senior management of the

10

Defendant. If that incident motivated the adverse employment actions taken against the Plaintiff, he could succeed on his claim. The Complaint alleges that in 2001, the Plaintiff recommended to his division and the corporate staff that a 3% commission, which the Plaintiff believed to be a bribe, be rescinded. The Plaintiff could present facts consistent with this incident that he was reporting illegal conduct of the type prohibited by § 1514A and that this motivated his termination. In sum, the Plaintiff claims that he provided information regarding the Kuwait bribery scheme to those with the power to investigate, discover, or terminate misconduct, and no facts alleged in the Complaint contradict this assertion. The Complaint is sufficient to state a claim.

The Defendant's argument that the Plaintiff's protected conduct occurred after the adverse employment action and its argument that the adverse employment decision occurred outside of the statute of limitations depend on when the adverse employment action occurred. A violation does not occur until an employer makes and communicates a final decision to the employee. *Del. State Coll. v. Ricks*, 449 U.S. 250, 259 (1980). The Seventh Circuit has expanded the framework, "essentially creating a two-prong test to determine the date of an unlawful employment practice: (1) 'there must be a final, ultimate, non-tentative decision to terminate the employee;' and (2) 'the employer must give the employee 'unequivocal' notice of its final termination decision.'" *Smith v. Potter*, 445 F.3d 1000, 1007 (7th Cir. 2006) (quoting *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004)).

The Defendant argues that the Plaintiff knew in December he would not be the Kuwait Program Manager. However, the Complaint does not say the Plaintiff knew he would not be Kuwait Program Manager in December. Taking all inferences to favor the Plaintiff, he might not

11

have known he would not be Program Manager until January 9th, when Noble announced that the Defendant was interviewing for the position. The Plaintiff responded that he thought he was the Defendant's representative in Kuwait, suggesting he did not know he was being replaced.

The Defendant goes on to argue that the only discriminatory act alleged by the Plaintiff was his removal from his position as Kuwait Program Manager, and that his termination was simply an effect of this removal, and therefore does not count as a violation. The Defendant relies on *Ricks*, in which the Court held that a claim accrues only when the discrimination occurs, not when the painful effects of the discriminatory decision occur. *Ricks*, 449 U.S. at 258.

This Court disagrees with the Defendant's argument. The Complaint alleges that the termination decision itself was a discriminatory act. There is no basis in the Complaint to support the Defendant's characterization of the termination as an effect of the decision to remove the Plaintiff from his position as Kuwait Program Manager. The Complaint refers to discussions concerning other possible jobs for the Plaintiff. He was listed as "export production" on the January organizational chart. Also, On January 30, 2003, Bligh told the Plaintiff they wanted him to return to work, though it is not clear what position he would return to, as they had hired Jungquist to take the Plaintiff's old job. The Plaintiff could show that both his removal from the Kuwait Program Manager position and his termination from the company were independent actions taken in retaliation for reporting the bribery scheme.

Because the Plaintiff could prove consistent with the Complaint that the termination decision itself was a discriminatory act, the date of the termination decision is relevant. It is unclear from the Complaint when he was actually terminated. The Defendant's supervisors did not mention termination to the Plaintiff until January 22, 2003. The Plaintiff could present facts

12

consistent with his Complaint that an unequivocal notice of termination was not communicated to him until February, or later, as he was told several times he was not terminated but on suspension. He was told on January 30, 2003, and again in February that he was on suspension. He worked with the Defendant's in-house counsel when counsel investigated the Plaintiff's charges. What the Defendant told to the Plaintiff regarding his suspension status and the possibility of his returning to work is not clear. In November 2004, he was told that he had been on inactive status, and that his active employment had ended in early 2003. It is unclear when the Defendant communicated an unequivocal notice of termination to the Plaintiff.

Because the timing of the adverse employment decisions cannot be determined from the Complaint, the Court cannot determine whether the alleged protected activities occurred before or after the adverse employment decisions. In addition, the Complaint alleges activities that may be protected that clearly occurred before any adverse employment decision. The Plaintiff gave information to investigators in 1997. In 2001, he recommended eliminating a 3% commission that he thought would be used to pay bribes. These incidents could be shown to be protected activities. The Plaintiff could prove, consistent with the Complaint, that his termination or suspension was motivated by the fact that he provided information to superiors concerning the alleged bribery scheme.

Section 1514A(b)(2)(D) states that an action under that statute "shall be commenced not later than 90 days after the date on which the violation occurs." The Plaintiff filed his administrative complaint on April 9, 2003. Therefore, any adverse employment action occurring before January 8, 2003, is outside of the statute of limitations. As previously stated, the Plaintiff could present facts consistent with his Complaint showing that the decision to remove him from

13

his position as Kuwait Program Manager was first communicated to him on January 9, 2003, and the decision to terminate him was not communicated to him until after that. Therefore, his claims cannot be dismissed at this stage for falling outside of the statute of limitations.

### F. Plaintiff's Wrongful Discharge Claim

The Defendant argues that the Plaintiff has failed to state a claim of wrongful discharge because he was terminable at will and no exception to the doctrine applies to the facts alleged. The Court disagrees; the Complaint states a claim for wrongful discharge for which relief may be granted.

Under Indiana law, an employee hired at will is presumptively terminable at any time, with or without cause. There is no exception to the employment at will doctrine for employees reporting their employers' unlawful activities. *Martin v. Platt*, 386 N.E.2d 1026, 1028 (Ind. Ct. App. 1979). However, firing an employee for refusing to commit an illegal act for which he would be personally liable constitutes wrongful discharge. *McClanahan v. Remington Freight Lines, Inc.*, 517 N.E.2d 390, 393 (Ind. 1988). Also, firing an employee for exercising a statutorily conferred right constitutes wrongful discharge. *Frampton v. Cent. Ind. Gas Co.*, 297 N.E.2d 425 (Ind. 1973).

The Defendant is incorrect in arguing that nothing in the Complaint suggests the Plaintiff was fired for engaging in conduct that would have exposed him to personal liability. The Complaint alleges that he was fired because he refused to participate in activities that were prohibited by law. It refers to the Foreign Corrupt Practices Act, which prohibits employees of certain companies from giving valuable consideration to foreign officials to influence the decisions of the official. 15 U.S.C. §§ 78dd-1(a), 78ff(c)(2)(A). An employee who violates the section may be fined up to $100,000 and

14

imprisoned for five years.  15 U.S.C. § 78ff(c)(2)(A).

The Defendant argues that the Plaintiff was excluded from the negotiation of the Kuwait contract and was transferred back to the United States, and could not have been in the position of committing illegal acts. However, the Plaintiff could show that he was excluded and sent back to the United States because he made it clear he would not go along with the bribery scheme, and that this eventually led to his termination. This is what the Complaint implies when it states: "At the time [the Defendant] transferred [the Plaintiff] back to the United States, [the Defendant's] managers were aware that he had become increasingly concerned that [the Defendant's] managers were reverting to illegal kickbacks or bribes, either through an unexpected increase in the commission rate, or through payments to an 'offset' company with governmental connections." (Compl. 10, DE 1.)

Because the Plaintiff could prove facts consistent with his Complaint showing he was fired for refusing to engage in conduct for which he could be personally liable, his Complaint states a claim for which relief could be granted.

**G.     Plaintiff's Claims for Blacklisting and Tortious Interference With Business Relations**

The Defendant argues that the Plaintiff's blacklisting claim should be dismissed because it "fails to plead the essential elements of a blacklisting claim." (Def. Mem. Law Supp. Mot. Dismiss 15, DE 42-6.) The missing element, according to the Defendant, is that the Plaintiff "conspicuously fails to allege that ITT communicated at all with the National Company, or that any such communications were false." (Def. Mem. 16, DE 42-6.)

"Any decision declaring 'this complaint is deficient because it does not allege X' is a

15

candidate for summary reversal" *Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 715 (7th Cir. 2006). This Court does not wish to be summarily reversed, and so it denies the Defendant's motion for dismissal of the Plaintiff's blacklisting claim. The Complaint sufficiently describes the complained of conduct so that the Defendant is on notice of the nature of the Plaintiff's claim. It states that he was fired from his job with the National Company in Kuwait shortly after starting, that the Defendant knew he was in Kuwait, and that the Defendant interfered with his employer causing his termination.

The Defendant's argument that the Plaintiff's tortious interference claim is incorrectly pled fails for the same reason. To recover under a claim of tortious interference with a contractual relationship, the Plaintiff must prove he had a contract, the defendant knew of the contract, the defendant intentionally induced the breach of the contract without justification, and the plaintiff suffered damages as a result. *Newman v. Deiter*, 702 N.E.2d 1093, 1101 (Ind. App. 1998)  The Plaintiff could prove these elements without contradicting his Complaint.

### H.    The Court's Subject Matter Jurisdiction to Consider the Plaintiff's Claims for Blacklisting and Tortious Interference

The Defendant's final argument is that the Court lacks subject matter to consider the Plaintiff's state law claims for blacklisting and tortious interference.

Title 28 U.S.C. § 1367 states that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." In this case, the Plaintiff's 18 U.S.C. § 1514A claim  is the claim over which the Court has original jurisdiction. The question then is whether the blacklisting and tortious interference claims are part

16

of the same case or controversy under Article III of the Constitution.

Whether a claim is part of the same case or controversy as the claim within a court's original jurisdiction is determined according to the standard for exercising pendent jurisdiction set forth in *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966). In *Gibbs*, the Supreme Court held that federal courts may exercise pendant jurisdiction over a state claim if the state and federal claims "derive from a common nucleus of operative fact," so that the claims "are such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *Id.* at 725. "A loose factual connection between the claims is generally sufficient" to meet this requirement. *Ammerman v. Sween,* 54 F.3d 423, 424 (7th Cir. 1995).

The parties offer little help in analyzing the Court's supplemental jurisdiction over the blacklisting and tortious interference claims, as neither party has offered any relevant caselaw. The Defendant asserts only that those claims are "simply not a part of the 'same case or controversy'" as the federal claim. (Def. Br. 19, DE 42-6; Def. Reply 10, DE 46-1.) The Plaintiff responds that the state law claims arise from the Defendant's ongoing retaliatory conduct against the Plaintiff because he persisted in claiming the Defendant bribed Kuwait officials.

The Court agrees with the Plaintiff that the blacklisting and tortious interference claims arise from the same common nucleus of operative facts as the federal retaliation claim. According to the Complaint, the Defendant's motivation for terminating the Plaintiff and for interfering with his employment in Kuwait with the National company was the same: the desire to punish the Plaintiff for reporting and refusing to go along with the bribery scheme. Though the Defendant's motivation is not part of an element of either the blacklisting or tortious interference claim, it would be relevant evidence in proving those claims. The history of the relationship between the Defendant and the

17

Plaintiff, including the bribery scheme and the Plaintiff's termination, are relevant to explain why the Defendant would want to interfere with the Plaintiff's subsequent employment and to provide background. Also, the facts regarding the Plaintiff's subsequent employment are relevant to the Plaintiff's damages from his termination. The claims involve facts sufficiently similar so that one would expect that the claims would be tried in one proceeding rather than having two separate proceedings involving evidence of many of the same facts.

There is, at the very least, a loose factual connection between the claims, and so the Court finds that it has supplemental jurisdiction to consider the Plaintiff's blacklisting and tortious interference claims.

**ORDER**

The Defendant's motion to dismiss [DE 41] is DENIED.

SO ORDERED on January 12, 2007.

    s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT